[L. A. No. 16488. In Bank.—February 17, 1941.]

CHARLES FORBES, as Executor, etc., Respondent, v. BOARD OF MISSIONS OF THE METHODIST EPISCOPAL CHURCH, SOUTH (a Corporation), et al., Appellants.

Newby & Newby and Dee Holder for Appellants.

Bachtell & Clanton, Constance Leitch, S. N. Bachtell and Caryl Warner for Respondent.

CURTIS, J.—This action is one to set aside a grant deed, to quiet title to the real property described therein, and for an accounting of the rents, issues and profits derived from said real property during the time the defendants were in the possession thereof.

The deed was executed by Apolonio Bailon Zapata and Erolinda Moreno Zapata, husband and wife, as grantors in favor of the Board of Missions of the Methodist Episcopal Church, South, and bore date April 23, 1932. The grantors were members of the Homer Toberman Mission in Los Angeles, a religious organization under the jurisdiction of the Methodist Episcopal Church, South. They were much interested in the work of the local church. Mr. Zapata had been for several years president of the board of stewards, the local governing board of said church. Both Mr. and Mrs. Zapata were of Spanish descent. Mr. Zapata spoke and wrote English and followed the profession of teacher of

Spanish. Mrs. Zapata did not speak English and understood the language only to a very limited extent. They had no children, and no relatives in whom they were particularly interested.

They were the owners as joint tenants of two pieces of improved real property in Los Angeles, which brought them in a substantial income. Some two years prior to the execution of said deed Mr. Zapata had spoken to Mr. Rameriz, the pastor of the local church, and stated that he and his wife had been thinking for some time about turning their property over to the church when they died. Mr. Rameriz told Mr. Zapata that he knew nothing about such matters, but would speak to Mr. Reynolds, the presiding elder of the church, concerning the matter. He mentioned to Mr. Reynolds the conversation he had with Mr. Zapata, but nothing was done in regard to the matter for some considerable time, when Mr. Zapata again spoke to Mr. Rameriz and inquired if he had done anything about having the property conveyed to the church. Mr. Rameriz replied that he had spoken to Mr. Reynolds and that was all he could do. Mr. Zapata then saw Mr. Reynolds and they had several conversations, in which Mr. Zapata said that he desired his wife to be the beneficiary of his property and to have all income therefrom during her lifetime, and that upon her death he wanted the church, the Board of Missions, to have the property. He said they desired to make a deed to that effect and asked Mr. Reynolds to secure an attorney to draw the necessary papers. As a result of this conversation Mr. Nathan Newby was consulted and engaged to prepare the legal papers required for the transfer of the property.

Prior to this time Mr. Zapata had frequently talked with Mr. Fitzgerald, a former pastor of the local church, in regard to conveying the property to the church, but Mr. Fitzgerald had said nothing about the matter to anyone. Mr. Fitzgerald had been a former pastor of the Homer Toberman Mission and an old acquaintance of both Mr. and Mrs. Zapata, but had retired from the pastorate in 1920, and since that time had no official connection either with the local church or the Board of Missions.

Mr. Zapata was greatly interested in a young boy who was then residing in his family by the name of Antonio Alberto Zapata. Mr. and Mrs. Zapata desired to assist in his educa-

tion, provided he decided to study for the ministry, and to provide means for his education out of the proceeds of their property in case he had not finished his education before the death of both Mr. and Mrs. Zapata.

From the information furnished him by Mr. Zapata and Mr. Reynolds, Mr. Newby prepared three documents for the purpose of carrying out the wishes of Mr. and Mrs. Zapata to transfer their property to the Board of Missions. These documents were a grant deed, an agreement and a letter to Mr. Fitzgerald. The grant deed was to be executed by Mr. and Mrs. Zapata in favor of the Board of Missions, by which they conveyed their property to said board, reserving to themselves and to the survivor a life estate in said real property and the rents, issues and profits thereof. The agreement was between the Zapatas and the Board of Missions, whereby the latter agreed to supervise the education of Antonio Alberto Zapata, provided his education was not finished before the death of the survivor of Mr. and Mrs. Zapata, if he should desire to become a minister, and to devote one-half of the proceeds of the property conveyed to the board for the education of said Antonio Alberto Zapata. The letter to Mr. Fitzgerald was signed by Mr. and Mrs. Zapata, and directed him to hold the grant deed until the agreement was properly executed by the Board of Missions, and then to deliver the agreement to the Zapatas and file the deed for recording. The Board of Missions was a corporation organized and having its principal place of business at Nashville, Tennessee, and it was necessary to send the agreement to the board at Nashville, Tennessee, for its execution by said board.

After these papers were drawn, they were taken to the Zapata home on April 23, 1932, by Mr. Newby. Accompanying Mr. Newby were Mr. Reynolds, Mr. Fitzgerald and Mr. Dee Holder, the latter a notary public. Mr. Fitzgerald, who understood and spoke Spanish, read the papers and interpreted them from English to Spanish for Mrs. Zapata's benefit. Mrs. Zapata asked that a change be made in the agreement, so that it would provide that in case it should ever be necessary to sell the property, or any portion of it, for the purpose of purchasing necessaries of life for herself, the Board of Missions would join in a quitclaim deed to the purchaser. Due to this change in the agreement the papers were

not signed on that date, but were returned to the office of the attorney. There the addition to the agreement asked for by Mrs. Zapata (being subdivision [4] hereinafter set out) was made, and on May 14, 1932, three weeks after the first visit, the papers were again taken to the Zapatas and submitted to Mr. and Mrs. Zapata. There were present at this meeting besides Mr. and Mrs. Zapata, Mr. Reynolds, Mr. Fitzgerald and Mr. E. B. Hughes, a notary public. The papers were again read to Mr. and Mrs. Zapata, translated by Mr. Fitzgerald, as before, and were signed and executed, and the deed and agreement acknowledged before the notary by Mr. and Mrs. Zapata. They were then delivered to Mr. Fitzgerald, who, in accordance with said letter of instructions, was to hold the deed and send the agreement to the Board of Missions. On July 7, 1932, Mr. Zapata died. On December 8, 1932, the Board of Missions executed and acknowledged the agreement, and it was returned to Mr. Fitzgerald, who delivered it to Mrs. Zapata on January 3, 1933, the deed having been recorded on December 31, 1932. On November 14, 1935, Mrs. Zapata died and this action was instituted a short time thereafter by the executor of her last will and testament. The trial court made findings and rendered judgment in favor of the plaintiff, and the defendants, the Board of Missions and J. H. Fitzgerald, have appealed.

In support of the judgment it is first contended by the respondent that Mr. and Mrs. Zapata made a joint offer or proposal, which was intended to be accepted, if at all, during their joint lives, and that as the offer was not accepted until after the death of Mr. Zapata, the acceptance was ineffectual for any purpose.

The deed executed by the Zapatas in favor of the Board of Missions was not a strict deed of gift, but on the other hand it was a conveyance to the board in part at least in consideration of the board's agreement to supervise and, under certain contingencies, to finance the education for the ministry of the youth Antonio. The agreement of May 14, 1932, after reciting the fact that the Zapatas had conveyed the real property to the Board of Missions, continues:

"WHEREAS, the parties of the second part (the Zapatas) desire that Antonio Alberto Zapata (born July 19, 1925, and a relative of the grantors) should be properly educated for the ministry in the event he is called, and when he arrives at

the age of discretion desires to prepare himself for said calling; and

"WHEREAS, the parties of the second part desire the party of the first part (the Board of Missions) to supervise said education in the event they should die before said education shall have been completed,

"NOW THEREFORE, IT IS AGREED by and between the parties, as follows:

(1) That during the life of the parties of the second part, or the survivor of them, the entire obligation for the education of said Antonio Alberto Zapata shall rest upon the parties of the second part, exclusively.

(2) In the event the parties of the second part should die before the education of the said Antonio Alberto Zapata shall have been completed, the party of the first part agrees to supervise the ministerial education of the said Antonio Alberto Zapata, if he should desire to become a minister, and will expend at least fifty per cent of the net income derived from the property herein described and this day conveyed to the party of the first part, but shall not be compelled to expend upon the education of said Antonio Alberto Zapata any sum in excess of fifty per cent of the net income derived from said property, and the party of the first part shall be the sole judge of the school or schools in which the said Antonio Alberto Zapata shall be educated, and the amount that shall be expended upon his education.

(3) In the event the said Antonio Alberto Zapata shall have reached the age of maturity, or his education shall have been completed prior to the death of the survivor of the parties of the second part, the said party of the first part shall be under no obligation to expend any sum on the education of the said Antonio Alberto Zapata, or for any other purpose, and may use the entire income for its own purposes.

(4) In the event it shall become necessary for the parties of the second part, or the survivor of them, to sell said property or any portion of it for the purpose of purchasing the necessaries of life, but not otherwise, the party of the first part agrees to consent to said sale and to join in the execution of a quitclaim deed conveying said property so sold to the purchaser; provided, however, in the event of such sale, the party of the first part reserves the option to cancel

this agreement upon conveying by quitclaim deed to the parties of the second part, or the survivor of them, the remainder of said property, if any.''

█ Evidently each of the Zapatas was interested in the education of the youth Antonio, and the offer they made to convey said real property was at least in part consideration of the promise of the board to supervise his education. They each therefore received some benefit from the consideration under said grant deed.

''Where all the parties who unite in a promise receive some benefit from the consideration, whether past or present, their promise is presumed to be joint and several.'' (Civ. Code, sec. 1659.)

There is not one word of evidence in this case that the offer of the Zapatas to convey their property was a joint offer. In the absence of such evidence, the presumption stated in the above section must control. (*Gummer* v. *Mairs*, 140 Cal. 535, 537 [74 Pac. 26] ; *County of Los Angeles* v. *Luscher*, 58 Cal. App. 632, 634 [209 Pac. 899].)

█ But even if it were a joint offer, it is well settled in this state that the death or release of one joint obligor does not release the other. (Civ. Code, sec. 1543; *Bee* v. *Cooper*, 217 Cal. 96, 101 [17 Pac. (2d) 740] ; *Harrier* v. *Bassford*, 145 Cal. 529, 533 [78 Pac. 1038] ; *Elizalde* v. *Murphy*, 146 Cal. 168, 171 [79 Pac. 866].) This rule is peculiarly applicable in this case where the property was held in joint tenancy, and upon the death of Mr. Zapata, the title to the whole of the property became vested in Mrs. Zapata.

Further reliance is placed by respondent in support of said judgment upon the finding of the trial court that the offer or proposal of the Zapatas ''was contingent upon the same being accepted and the said proposed agreement executed by the defendant church in any event prior to the death of either the said Zapata or his said wife''.

We fail to find any evidence in the record before us in support of this finding. The matter was not discussed by any of the parties present on the occasion when the papers were executed by the Zapatas, or on the prior occasion when the papers were presented to them, or on any other occasion when the question of said conveyance was being discussed. The evidence does show that Mr. Zapata made frequent mention to different members of the church of the wish

of himself and wife to deed the property to the church, but on none of these occasions was any reference made to the matters embraced within the finding above quoted.

■ The court further found that the lapse of over six months between the offer or proposal and the date of the assumed acceptance thereof was unreasonable and therefore "said offer or proposal on behalf of said Zapata and wife, and each of them, was prior to the 8th day of December, 1932 (the date the Board of Missions executed and acknowledged the agreement) revoked . . . by the lapse of a reasonable time without communication of acceptance or acceptance of said offer or proposal by defendant church". Conceding that the question as to what was a reasonable time was a question of fact to be determined by the trial court, the delay of the Board of Missions in accepting the offer of the Zapatas might have furnished legal grounds for Mrs. Zapata to have declined to accept the written agreement of the board. However, she made no objection to the delay, received the agreement and gave to Mr. Fitzgerald her written receipt for the same. She thereby waived the right to complain of said delay. (*Parry* v. *Campbell*, 72 Cal. App. 748, 753 [238 Pac. 127].) The Zapatas knew that the deed would have to be sent to the Board of Missions at Nashville, Tennessee, and that the board would have to be satisfied with the character of the property conveyed to it before it would sign the agreement and accept the deed. There is absolutely no showing that Mrs. Zapata suffered any damage by the delay or that she expressed any dissatisfaction that the agreement was not delivered to her at an earlier date than that on which she received it.

■ The court further found that after the death of Mr. Zapata "Mrs. Zapata was ignorant of her rights in connection with said transaction and repeatedly demanded of and from defendant Fitzgerald the return to her of the said proposed deed and agreement and information concerning her said rights, but to return the same or to truthfully inform her concerning her said rights, said defendant did not, but to the contrary, upon defendant church assuming to execute said proposed agreement, did assume to deliver said purported deed to defendant church and the same was recorded, as hereinbefore set forth, and during the remainder of the life of said Erolinda Moreno Zapata, and until her death on the 14th of November, 1935, the defendant Fitzgerald, as

agent for defendant church corporation, and with the full knowledge, acquiescence and/or ratification of defendant church, and well knowing of her said ignorance in respect to her rights in connection with the matter and of her hereinbefore mentioned inability to read or write or converse in the English language, did designedly deceive and mislead her concerning her right of ownership of said real property free and clear from the effect of said purported deed and purported agreement and did designedly deceive and mislead her concerning her rights in connection with said transaction and the meaning of the language used in the said purported agreement and/or the effect on said transaction of the death of said Zapata and/or lapse of time intervening between said offer and attempted acceptance thereof by said church and did designedly prevent her from consulting any other person in regard to said foregoing matters, and as a result thereof, the court finds that the said Erolinda Moreno Zapata was misled and deceived thereby and never knew her rights in connection with said transaction and by reason thereof, during her lifetime, was prevented from taking any legal action for the protection and/or enforcement of her rights in connection with said transaction and/or said property, and by reason thereof the Court finds that the said Erolinda Moreno Zapata was not barred or estopped during her lifetime either by laches or the Statute of Limitations or otherwise or at all from taking or commencing any appropriate legal action for the protection of her rights therein, and obtaining cancellation of said purported agreement and purported deed and/or obtaining a reconveyance of said real property to her.''

We have searched the record in this case from one end to the other for the evidence to support this finding or some portion thereof, and as a result of our efforts we are compelled to say that there is a complete dearth of any evidence which directly or indirectly supports this finding or any statement therein contained. When Mr. Fitzgerald received the agreement after its execution and acknowledgment by the Board of Missions, he gave it to Mrs. Zapata and recorded the deed in accordance with the written instructions given him at the time the deed was executed by Mr. and Mrs. Zapata. No question was raised at that time by Mrs. Zapata or by any other person as to the effect of the death of her husband,

or the lapse of time between the execution of the deed and the return of the agreement by the Board of Missions. Mr. Fitzgerald was not a lawyer, and no claim is made that he had any misgivings as to the legal effect of the death of Mr. Zapata or the lapse of time upon the delivery of the deed and agreement. The matter was not discussed between him and Mrs. Zapata in any shape, form or manner. She accepted the agreement and signed a receipt therefor without a word of protest, and was perfectly satisfied with the whole transaction at that time. There was no attempt to deceive nor was there any deception, for neither Mrs. Zapata nor Mr. Fitzgerald had any thought that either the death of Mr. Zapata or the delay in the execution and delivery of the agreement would have any effect upon the validity of the deed.

The same positive statement may be made in regard to the finding that Mr. Fitzgerald prevented Mrs. Zapata from consulting any other persons in regard to these matters. Mrs. Zapata had a copy of the agreement defining her rights in this transaction. She was free to submit this agreement to any person whom she might choose to consult. She had her friends. She attended church regularly and associated with her friends and acquaintances both inside and outside the church, and had ample opportunity to seek advice where and when and from whom she wished. Furthermore, there is not one word of evidence in this whole record that Mr. Fitzgerald ever directly or indirectly asked, or even suggested to her, that she should not consult others or seek advice from them respecting this or any other business matter in which she was interested. On one occasion when she was worrying about her property, a friend said to her, "Get the papers and I will have my friend read them and take them to an attorney and see what it is". This friend, who was a Spanish teacher, was called in and told Mrs. Zapata "what he would do". But instead of submitting the matter to an attorney, as she was entirely free to do, she called Mr. Fitzgerald, with the result that the matter was dropped.

Mrs. Zapata was apparently entirely satisfied with the conveyance she and her husband had made to the Board of Missions, at the time she received the agreement from Mr. Fitzgerald and for some considerable time thereafter. She subsequently, however, for some reason not clearly appearing

from the evidence, began to worry about her property. Whether she was dissatisfied with the original transfer of the property to the board or whether she wished her property returned to her for other reasons, we are unable to determine. That she wanted her property back is clear, but the reason on which she based her demand is not clear.

As to the conveyance which she and her husband executed to the Board of Missions, we have already stated the circumstances surrounding and leading up to said transaction. That she thoroughly understood the purpose and effect of the deed by herself and husband to the Board of Missions is shown by the undisputed testimony of those present on that occasion. Both Mr. Fitzgerald and Mr. Reynolds, the latter then presiding elder of the church, understood and spoke the Spanish language, and they each testified that the contents of the deed, the agreement and the letter to Mr. Fitzgerald were correctly translated and explained to Mrs. Zapata before she executed them. That Mr. Fitzgerald's translation and explanation of the papers was honest and correct is further shown, we think, by the execution of these papers by Mr. Zapata. He was a Spanish teacher and was thoroughly familiar with both the Spanish and English languages, and was present during the entire time when the papers were being interpreted and explained to Mrs. Zapata. Without the assistance of an interpreter, he knew the contents of the documents before signing them. He, of course, above all others was interested in having his wife protected in this transaction, and it is unbelievable that he would have executed the papers if any misrepresentation had been made by Mr. Fitzgerald to Mrs. Zapata as to the contents and meaning of the documents she was to sign. She therefore assented to the transaction with full knowledge of what she was doing, and consequently had no legal right thereafter to complain of the conveyance of the property to the Board of Missions, or to ask that it be returned to her.

Under subdivision [4] of the agreement it was provided that in case it became necessary for her to sell the property conveyed to her and her husband, or any portion thereof, for the purpose of purchasing the necessaries of life, the Board of Missions agreed to execute a quitclaim deed conveying the property so sold to the purchaser. Under this provision of the agreement she would have been entitled to

a quitclaim deed in favor of a purchaser in case it was necessary for her to sell any portion of the property in order to provide her with the necessaries of life. It may have been and probably was under this right reserved in her favor, that she "wanted her property back". Aside from the fact that she found no purchaser for any part of the property, and therefore it was impossible for the Board of Missions to execute a quitclaim deed, as provided in said agreement, even if any had been demanded, there is no substantial showing that she was at any appreciable length of time in need of the necessaries of life. She on one occasion went "to the relief station to get help" and "secured something". Mr. Fitzgerald at her request went with her for the purpose of interpreting for her. Just how long she received help from the relief station is not shown; neither does it appear when she made this application for help, nor is it shown anywhere that she was in actual need of help at that or at any other time. When she was taken to the hospital in September, 1935, some two months before her death, she had $50 in money on her person, $185 in the savings bank account, and she had been receiving the rentals from the property ever since the death of her husband, which the plaintiff in this case testified were $125 per month. The evidence further shows that she paid no taxes on the property for a year before her death, so that she had practically the entire income from the rentals. The only condition under which she was entitled to a quitclaim deed to the purchaser in case she sold the property, or any part thereof, was that she should be in need of the necessaries of life; and as there is no evidence that she was in that state, there was no obligation upon the part of the Board of Missions, even if a purchaser had been found and demand had been made, to execute a quitclaim deed to said purchaser, or to have her property given back.

A short time prior to her death Mrs. Zapata secured the services of a firm of attorneys. She was then in the hospital, but in full possession of mental faculties. These attorneys prepared a will in which the plaintiff herein was appointed as her executor. She evidently laid before her attorneys her grievances against the Board of Missions and the reason why she wanted her property back. As a result of this conference between her and her attorneys, the latter prepared a draft of a grant deed by the Board of Missions

to Mrs. Zapata of the property which she and her husband had conveyed to the board. This draft of the deed was forwarded to the Board of Missions at its principal place of business at Nashville, Tennessee, accompanied by a letter containing the following statement:

"Mrs. Zapata is ill on her back in the hospital greatly in need of funds and inasmuch as the purpose of this agreement, i. e., providing for the education of the boy as a Protestant Minister, has failed, the boy having returned to his Catholic father, we are asking that you execute the enclosed deed conveying the properties to Mrs. Zapata in order that she may raise sufficient money to properly care for and maintain herself. Please send the deed to me when it has been executed."

From this letter we might rightly infer that the burden of Mrs. Zapata's claim for wanting her property back was that the "purpose of this agreement, i. e., providing for the education of the boy as a Protestant Minister, has failed". No claim was then made that any unfair or fraudulent advantage had been taken of her by anyone in the procuring of the deed, or that she did not understand the contents of the papers when she signed them, or that she was then so greatly in need of the "necessaries of life" as to be entitled to a quitclaim deed to the property in favor of any purchaser. It is true that the letter states that Mrs. Zapata was greatly in need of funds, but the demand for the deed was not placed on that ground, evidently for the reason that she then had $185 in the bank and was receiving the rentals from the property.

The material parts of the agreement, and particularly those parts referring to the education of the boy Antonio, are set forth above. A mere reading of these paragraphs of the agreement shows that they contain nothing which would justify the demand for a reconveyance of the property on the ground expressed in said letter. It might be well to state here, although the matter is of slight importance, that the boy Antonio was living with Mr. and Mrs. Zapata at the time the deed and other papers were executed. He was then about nine years old. At the time of the trial, December, 1936, he was being educated, with the consent of his father, under the direction of the Board of Missions in the Lydia Patterson Institute at El Paso, Texas. Evidently, the Board of Mis-

sions was carrying out its agreement in respect to the boy's education.

Although the complaint alleged fraud on the part of the appellants in inducing the execution of the agreement, deed and letter of instructions to Mr. Fitzgerald, the court made no finding to that effect, and our review of the record convinces us that there was no evidence which would have supported such a finding. While the documents were executed less than two months before the death of Mr. Zapata, their execution was in no sense a death-bed transaction. On the other hand, it was the consummation of a desire first expressed by Mr. Zapata two years before, and frequently repeated by him to various persons, until finally Mr. Reynolds at Mr. Zapata's urgent solicitation, took the matter in hand and had the necessary papers prepared. It cannot be claimed that there was any undue haste on the part of any of the parties interested in the transfer of the property to the Board of Missions. It was the Zapatas, and not the Board of Missions, that insisted on the transaction being closed. A further circumstance evidencing the fact that the transaction was not a case where overzealous persons wrung from a dying man on his death-bed, as contended by respondent, a conveyance of his property, is that when the papers were first taken to the Zapata home and due to a suggestion of Mrs. Zapata, a correction was to be made in the terms of the agreement, they were not again taken to the Zapatas until three weeks after the first occasion.

The entire transaction from the beginning to the end was marked with due deliberation, and every opportunity was given to Mr. and Mrs. Zapata to exercise their independent judgment before acting in the matter. The record is free from any evidence that any fraud or undue influence was practiced upon them, or either of them, to induce them to make the conveyance of their property to the Board of Missions. The findings leading to a contrary conclusion are unsupported by the evidence. For this reason the judgment should be and is reversed.

Shenk, J., Carter, J., Edmonds, J., Traynor, J., and Gibson, C. J., concurred.

A petition for a rehearing was denied March 17, 1941.